**In re EVELETH MINES, LLC, dba Evtac Mining, and Thunderbird Mining Co., Debtors.**

Nos. 03–50569, 03–50641.

United States Bankruptcy Court, D. Minnesota.

July 30, 2004.

Michael L. Meyer, Ravich, Meyer, Kirkman, McGrath & Nauman, Minneapolis, MN, for Debtors.

## ORDER DENYING MOTION OF UNITED TACONITE, LLC FOR RELIEF IN CONNECTION WITH ORDER OF NOVEMBER 26, 2003

GREGORY F. KISHEL, Chief Judge.

This Chapter 11 case came on before the Court on March 17, 2004, for hearing on the motion of United Taconite, LLC ("United Taconite") for certain relief in connection with an order entered on November 26, 2003. United Taconite appeared by its attorney, Timothy D. Moratzka. The State of Minnesota, Department of Revenue ("MDOR") appeared by Jessica A. Palmer–Denig and Thomas K. Overton, Assistant Attorneys General. Other appearances were noted in the record. After the motion was taken under advisement, the record was reopened at MDOR's request to receive briefing on the issue of jurisdiction. The final submission on that issue was timely filed. Upon the relevant documents and the arguments of counsel, the Court makes the following order.

### PARTIES

The Debtor is a Minnesota business corporation that mined taconite (low-grade iron ore) and beneficiated it into a concentrated pellet form suitable for the production of steel. Its mine and plant (for brevity, "the facility") were located in and near the city of Eveleth, on the Mesabi Iron Range of northeastern Minnesota.

The Debtor[1] filed a voluntary petition for relief under Chapter 11 on May 1, 2003. On motion of the Debtor, the Court authorized the sale of the facility and most of the associated personalty to United Tac-

---

1. All references to "the Debtor" will signify Eveleth Mines, LLC alone, out of the two Debtors in these jointly-administered cases. Thunderbird Mining Co. was the entity that employed the personnel who operated the fa-

cility, and which contracted with Eveleth Mines, LLC to provide that staffing. The existence and operation of Thunderbird Mining Co. was not relevant to the disputes presented here.

onite. The sale closed, and United Taconite commenced production.

MDOR is responsible under Minnesota statute for the assessment of taxes on the production of beneficiated taconite and for the collection of those taxes.

### FINDINGS OF FACT

The facts relevant to this motion all arose after the Debtor's Chapter 11 filing.

Within several weeks after the Debtor commenced this case, it ceased mining and production operations and laid off almost all of its employees. The reason was the Debtor's lack of contracts for the sale of finished taconite pellets. During the summer of 2003, the Debtor's management searched for a new investor or a buyer of the Debtor's assets. In the early fall of 2003, a Chinese concern, Laiwu Steel Group, Ltd., and an American mining concern, Cleveland–Cliffs, Inc., made an offer in consort for the Debtor's assets. On October 29, 2003, the Court approved a set of procedures for the soliciting of further bids. A second bidder came forward. The Debtor's counsel conducted an auction on November 25, 2003. The Court then approved the Debtor's sale of its operating assets to United Taconite, a new entity in which Laiwu and Cleveland–Cliffs were the participants. The order authorizing the sale was entered on November 26, 2003.[2]

The terms under which United Taconite proposed to purchase the Debtor's assets were set forth in a document entitled "Asset Purchase Agreement." That document was dated and filed with the Court on November 7, 2003, in connection with the

Debtor's pending motion for approval of the sale. MDOR was among the entities served with this document.

In those provisions relevant to the motion at bar, the Asset Purchase Agreement provides:

> 2.4 *Retained and Assumed Liabilities of Seller.*
>
> (a) *Retained Liabilities.* Except for [certain] Assumed Liabilities [3] ..., [the Debtor] shall retain and Buyer [4] shall not assume, pay, ... [or] succeed to ... any of [the Debtor's] Liabilities, expenses or other obligations (whether known, unknown, fixed, unliquidated, absolute, or contingent), ... or Claims, including, but not limited to, any Claim or Liability relating to: ... (viii) any taconite production tax attributable to the mining and beneficiation of taconite ore into enriched iron ore pellets that has been or may be assessed by any Taxing authority for any period, including but not limited to the Minnesota Department of Revenue (but excluding any taconite production tax that is attributable to the mining and beneficiation of taconite ore into enriched iron ore pellets by any Person other than [the Debtor] or its Affiliates) (a "Taconite Production Tax"); *provided* that nothing contained in this clause (viii) shall constitute an admission by [the Debtor] that any of [the Debtor] or its Affiliates are liable to any Taxing authority

---

2. For brevity, this will be termed "the Asset Sale Order."

3. The identity of the "Assumed Liabilities" is not relevant to the matter at bar.

4. In the Asset Purchase Agreement and the Asset Sale Order, "the Buyer" was defined as a business entity that Laiwu and Cleveland–Cliffs were to form to take title to the assets. After United Taconite was formed, it was identified as that entity.

for any Taconite Production Tax...

In turn, the Asset Sale Order had relevant provisions of two sorts. Among its merged findings of fact and conclusions of law were:

17. The Buyer would not have entered into the [Asset Purchase] Agreement and would not consummate the sale contemplated by the [Asset Purchase] Agreement if the sale of the Mining Assets and the assignment of the Contracts were not free and clear of the [sic] all interests, liens, claims and encumbrances (other than those liabilities expressly assumed by the Buyer). This would impact materially and adversely on the Debtor's estates [sic] and would yield substantially less value for the Debtor's estate.

18. The Debtor may sell the Mining Assets free and clear of any and all liens, claims, interests or encumbrances in, upon or to the Mining Assets because all creditors claiming an interest in the Mining Assets either have not objected to the proposed sale or [have] withdrawn their objection and are deemed to have consented pursuant to § 363(f)(2) of the Bankruptcy Code or meet one of the conditions set forth in § 363(f) of the Bankruptcy Code.

Among the Order's dispositive terms were:

F. The Buyer shall not assume, and shall be deemed not to have assumed, any liabilities or obligations of the Debtor, except for ... (the "Assumed Liabilities"). The liabilities or obligations of [the] Debtor that represent Excluded Liabilities include, but are not limited to, any claims or liabilities relating to ...:
... (viii) any taconite production tax attributable to taconite ore or iron sulfides mined by [the] Debtor, to the mining of such taconite ore or iron sulfides by [the] Debtor, to the production of iron ore concentrate from that taconite ore or iron sulfides by [the] Debtor, or to the iron ore concentrate produced by [the] Debtor that has been or may in the future be assessed by any Taxing authority for any period pursuant to Minn.Stat. §§ 298.24–298.27...

G. Pursuant to §§ 105(a) and 363(f) of the Bankruptcy Code, the Debtor is authorized to transfer title to the Mining Assets to the Buyer free and clear of: (a) all interests, pledges, liens, judgments, demands, ... encumbrances, obligations for the payment of taconite production taxes related to the mining and production operations by [the] Debtor using the Mining Assets, on [sic] restrictions or charges of any kind or nature whatsoever (collectively, the "Liens"); and (b) all claims (as that term is defined in § 101(5) of the Bankruptcy Code), Liabilities, obligations, demands, options, rights, restrictions and interests, whether imposed by agreement, understanding, law, equity, any theory of successor liability of the Buyer to the Debtor, including de facto merger, substantial continuity under the WARN Act or any employee benefit plan, the Debtor's workers' compensation rating (which shall not apply to the Buyer), continued operation of the Mining Assets as the "taconite facility" (as that term is used in Minn.Stat. § 298.24) or continued operation of the Mining Assets as the "producer" (as that term is used in Minn.Stat. § 298.27) or otherwise, whether known or unknown, whether contingent, unliquidated, disputed, whether imposed by agreement, understanding, law, eq-

uity or otherwise, including without limitation those of a kind specified in §§ 502(g), 502(h) and 502(i) of the Bankruptcy Code, and whether arising before or after the commencement of this chapter 11 case (collectively, the "Claims"), except as any of the foregoing may constitute Assumed Liabilities.

The Debtor and United Taconite then closed the sale on December 3, 2003. After that, United Taconite took possession of the facility, recalled most of the mining and plant employees, and commenced taconite pellet production in its own right.

In late January, 2004, the Debtor and United Taconite each filed Taconite Production Reports with MDOR for the separate periods of their operations during 2003. The Debtor reported total production of 1,552,080 tons of finished taconite products during the months of January through May, 2003. United Taconite reported total production of 78,162 tons during the month of December, 2003, alone.

On February 13, 2004, MDOR issued a Notice of Taconite Production Tax to United Taconite. In that document, MDOR asserted that United Taconite was liable for $335,921.00 on account of its production during 2003. In an attached document entitled "Determination of the Taconite Production Tax," MDOR disclosed that it had calculated this amount as follows:

1. First, a "Taxable 3–year Avg. Tonnage" was obtained by totaling the reported annual production at the Eveleth facility during the years 2001, 2002, and 2003, then dividing that total by three, with the result being 3,331,611 tons in average annual production.

2. The statutory tax rate of $2.103 per ton was applied to this average figure to arrive at a "2003 Net Production Tax Liability" of $7,006,378.00.

3. This liability was then divided, "[due] to bankruptcy sale," between the Debtor and United Taconite based upon each company's fractional share of the facility's total production during 2003. The Debtor was assigned 95.2055% of the tax, for a liability of $6,670,457.00. United Taconite was assigned 4.7945% of the tax, for a liability of $335,921.00.

The "Determination" document set a due date of February 24, 2004, for payment of 50% of the full year's liability.

## MOTION AT BAR

United Taconite served and filed the motion at bar immediately after MDOR issued the Notice of Taconite Production Tax. United Taconite styled the motion as one "for prospective relief to prevent ongoing violations of" the Asset Sale Order. It sought relief "specifically enjoining forever ... any action to collect from [United Taconite] any tax attributable to or calculated based, in whole or in part, on [the] Debtor's operations ..."

In a supporting memorandum, United Taconite maintained that the terms of the Asset Sale Order prohibit MDOR from assessing taconite production tax against it on any basis other than a straight application of the statutory average and rate to the actual tonnage it produced in its own right during the three relevant years. In specific, United Taconite noted that it had had no production from the Eveleth facility for the two years preceding 2003. Thus, it argued, the quantum for production for years 2001 and 2002 to be factored into the three-year averaging process should be zero, resulting in an average that is one-third the (small) amount of its actual production in 2003.[5] To justify this calculus,

---

5. Getting down to actual numbers, United Taconite maintains that its averaged production taxable for 2003 was 26,054 tons (the

78,162 tonnage for 2003 plus zero tonnage for 2001 and 2002, divided by three). With the per-ton tax of $2.103 applied to this, it ar-

at least before this Court, United Taconite relied on bankruptcy law: it posited that any and all tax consequences of the Debtor's prior production experience were an "interest" in the underlying assets, which was extinguished by the Asset Sale Order under the authority of 11 U.S.C. § 363(f). Thus, it argued, as buyer it took the assets free and clear of any such consequences, with any production experience of the facility that accrued before its purchase of the operation to be excluded from the calculation of its liability.[6]

MDOR responded in the first instance on the merits. It argued that its method of liquidating taconite production tax liability, using three-year production averages, does not give rise to an "interest" in the real property that is exploited to produce the taconite, or in the personalty used in the exploitation. Hence, it argued, the order that detached liens and interests from the sold assets could not affect its right to use those methods to determine the tax liability attributable to the use of the facility for any time period.

In a reply memorandum, United Taconite expanded on its earlier arguments based on § 363(f). It also raised a new theory, in which it relied on the facial language of the Asset Sale Order and on the fact that that order was now final, non-appealable, and binding in its terms.

Counsel then appeared in open court and ably argued the substantive issues—which were taken as fully submitted for decision on the merits.

However, a month after that MDOR's counsel communicated with the Court via letter, raising the question of whether the Tax Injunction Act, 28 U.S.C. § 1341, deprived this Court of jurisdiction over United Taconite's motion. Because subject-matter jurisdiction is a threshold issue that can be raised at any time in a proceeding in the federal courts,[7] the Court ordered a status conference and afterwards directed further briefing on the matter.

Both issues-jurisdictional and substantive-are now fully submitted.

## DISCUSSION

### I. Jurisdiction.

#### A. Preliminary Observations.

Before addressing the two theories of MDOR's challenge to jurisdiction, it is appropriate to make several observations about the motion at bar.

■ First: This is a request to a court to construe the scope and effect of an order that that court entered earlier in a case before it. As a general matter, a court has the authority to interpret, clarify, apply, and enforce its own orders, especially where its jurisdiction to enter the

gued, MDOR should have assessed United Taconite's 2003 liability at $54,792.00.

6. United Taconite devoted the remainder of its initial brief to arguments countering a potential argument on jurisdiction-that the federal courts were deprived of jurisdiction to grant relief against MDOR by the Eleventh Amendment to the United States Constitution and *Seminole Tribe v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) and its progeny. MDOR has never asserted an Eleventh Amendment bar to jurisdiction, however.

7. *GMAC Commercial Credit LLC v. Dillard Dept. Stores, Inc.,* 357 F.3d 827, 828 (8th Cir.2004) ("Any party or the court may, at any time, raise the issue of subject matter jurisdiction ..."); *4:20 Communications, Inc. v. Paradigm Co.,* 336 F.3d 775, 778 (8th Cir. 2003) ("As parties may not expand the limited jurisdiction of the federal courts by waiver or consent, subject matter jurisdiction issues may first be raised at any time, even on appeal ...").

original order was not and is not at issue. *Koehler v. Grant,* 213 B.R. 567, 569 (8th Cir. BAP 1997) ("... [i]t is well-established that courts retain jurisdiction to enforce their own orders."). *See also In re Petrie Retail, Inc.,* 304 F.3d 223, 230 (2d Cir.2002) (a bankruptcy court retains jurisdiction to interpret and enforce its own orders). *Cf. In re Olsen,* 861 F.2d 188, 189 (8th Cir.1988) ("Bankruptcy courts have general authority to change the terms of their own orders when equity so requires ..."); *In re Klesalek,* 307 B.R. 648, 653 (8th Cir. BAP 2004) ("Surely, an appellate court must give due deference to any reasonable construction a trial court gives to its own orders ..."). This precept is in the fabric of the Bankruptcy Code. *See* 11 U.S.C. § 105(a)[8]; *In re Ragar,* 3 F.3d 1174, 1178 (8th Cir.1993) (affirming action taken by bankruptcy court pursuant to § 105—and subsequently adopted by district court—to enforce and implement its own order).

Second: The law that authorized the relief accorded in the original order, and that will bound the interpretation now sought, was a statute expressly committed to this Court's specialized expertise and limited jurisdiction. The procedure for a sale of assets of a bankruptcy estate free and clear of liens is authorized by paragraph (f) of 11 U.S.C. § 363, a provision in Subchapter IV (titled "Administrative Powers") of Chapter 3 (titled "Case Administration") of the Bankruptcy Code. This remedy of the estate implicates "a right created by the federal bankruptcy law (i.e., the power of the trustee to sell property) that, by its nature, arises only in the context of a bankruptcy case." *In re*

*Spain,* 103 B.R. 286, 293 (N.D.Ala.1988). It is virtually unique to the bankruptcy system; it is created under federal statute, and it is central to the bankruptcy court's mission of preserving value through coordinated administration of assets in a single central forum. *Id. See also In re B.J. McAdams, Inc.,* 66 F.3d 931, 935–936 (8th Cir.1995); *Abramowitz v. Palmer,* 999 F.2d 1274, 1276 (8th Cir.1993); *Munich American Reins. Co. v. Crawford,* 141 F.3d 585, 593 (5th Cir.1998); *In re Lemco Gypsum, Inc.,* 910 F.2d 784, 789 (11th Cir.1990); *Matter of Xonics, Inc.,* 813 F.2d 127, 131 (7th Cir.1987) (all emphasizing importance of maintaining single federal forum for comprehensive administration of assets of bankruptcy estate and treatment of all claims against them). United Taconite's motion concerns the scope of relief to be accorded under such a sale, authorized in the first instance by this federal forum and pursuant to this federal law. The underlying remedy was not created by state law, particularly not by Minnesota state tax law, however much some aspects of this dispute may be channelled by state law.

Third: Before the sale to United Taconite was closed, the parties recognized the substantive issues at bar.[9] The possibility of this dispute was first raised after Laiwu and Cleveland–Cliffs made their initial offer. It was a part of ongoing discussions that involved MDOR, through the final structuring of the Asset Purchase Agreement. Throughout, MDOR and its counsel refused to concede that a sale free and clear would take the facility's pre-sale production experience out of the calculation of

---

8. The second sentence of this provision reads: No provision of [the Bankruptcy Code] providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte,* taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

9. Counsel for both parties acknowledged this at oral argument.

United Taconite's post-sale production tax liability.[10] Nonetheless, MDOR did not object to a sale going forward. Nor did it object to the form of the Asset Sale Order that the Debtor proposed, that United Taconite supported, and that the Debtor's counsel ultimately presented to the Court for entry. In particular, MDOR did not object to the order's repeated references to taconite production tax liability, or to the language that addressed how the order would affect it. MDOR appeared, through several attorneys, at the hearing on the Debtor's motion to authorize the sale.

On the other hand, United Taconite did not refuse to close because it had not gotten an express grant of the concession—and it did proceed to closing.

Essentially, MDOR and United Taconite "agreed to disagree" on the issue, and to preserve it for later presentation in an appropriate forum. Both sides acted as if the Bankruptcy Court were that forum, all the way through the initial submission of United Taconite's motion on the merits. It was only weeks later that MDOR's counsel challenged the jurisdiction, after their client had given every previous indication that this was not an issue.

This consensual reservation of a dispute now cuts against both parties, in different ways. On the one hand, it undermines any plaint by United Taconite that MDOR had double-crossed it, or any legal theory of estoppel or reliance-to-its-detriment that would be built on that. Clearly, United Taconite did not make the issue a deal-breaker for its purchase from the Debtor. It proceeded to closing under the risk of an adverse determination on the reserved issue. It did so knowingly. As to MDOR, it is clear that forum and jurisdiction were *not* an articulated part of the parties' agreement-to-disagree. Before mid-April, MDOR gave every indication of being content with having the Bankruptcy Court pass on the substantive issue.[11] This puts a pall on its late-played gambit to shift the forum, and one that was entirely avoidable.

Nonetheless, because the issue of jurisdiction is of such moment in our federal system, it must be addressed and treated—no matter that its late raising delayed the final resolution of the substantive issue.

### B. Treatment.

### 1. Whether this Proceeding is Within the Scope of the Federal Courts' Bankruptcy Jurisdiction.

 MDOR's first point is that this Court does not have jurisdiction over United Taconite's motion in the first instance. It insists that the motion does not qualify under the jurisdictional grant of 28 U.S.C. § 1334(b).[12] MDOR centers this

---

**10.** One can envision several reasons—institutional, structural, legal, and political-why they could not make that concession.

**11.** The sequencing of MDOR's gamesmanship sits poorly-both as a matter of professional performance and foresight and as a matter of simple fair play. MDOR's counsel admitted that they had been prompted on the issue of jurisdiction when another bankruptcy judge in another judicial district applied the Tax Injunction Act to a dispute over Minnesota's taconite production tax, in the Chapter 11 case of a different steel producer. That ruling relegated the buyer of that debtor's Minneso-

ta-sited mine to litigating in a Minnesota state forum, administrative or judicial. The judge in that other case ruled *sua sponte* from the bench, and without a written memorandum of decision. He did so at a hearing conducted after the parties here had fully submitted their dispute on the merits. The relevant statutes and case law on jurisdiction had been on the books all along, however.

**12.** This statute creates the bankruptcy jurisdiction of the federal courts:

(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district

theory on its argument that the motion is not a proceeding "related to a case under [the Bankruptcy Code]" within the contemplation of 28 U.S.C. § 1334(b).[13] The reason for that, MDOR maintains, is that the outcome of the tax assessment, its enforcement, and even United Taconite's bankruptcy-law-based challenge to the assessment could not "conceivably have any effect on the estate being administered in bankruptcy," a requirement for related-proceeding jurisdiction. *See, e.g., National City Bank v. Coopers and Lybrand,* 802 F.2d 990, 994 (8th Cir.1986) (citing *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984)); *In re Dogpatch U.S.A., Inc.,* 810 F.2d 782, 786 (8th Cir.1987); *In re NWFX, Inc.,* 881 F.2d 530, 533 (8th Cir. 1989). *See also Celotex Corp. v. Edwards,* 514 U.S. 300, 308, 115 S.Ct. 1493, 1499, 131 L.Ed.2d 403 (1995) (noting that *Pacor* formulation for related proceeding had been adopted by nine of eleven circuits). Thus, MDOR maintains, the federal courts lack subject-matter jurisdiction over this motion in the first instance, and cannot entertain it.

In developing this argument, MDOR's counsel demonstrated a sagacious and nuanced understanding of the basic principles of bankruptcy jurisdiction. Their point about no resultant effect is attractive, at least in a very immediate sense. This motion does concern an assessment made against United Taconite alone, on the basis of taconite produced after the Debtor transferred the assets to it, and

MDOR can not and will not assert a claim against the Debtor's estate on account of that assessment. As a result, the enforcement of the assessment itself would have no direct, consequential "effect on the administration of the debtor's estate," *Abramowitz v. Palmer,* 999 F.2d at 1277.

The argument has a doubly-layered flaw, however. It stems from a limitation of perspective in its framing.

■ The first is MDOR's exclusive reliance on its characterization of the motion as a "related proceeding." MDOR is not inaccurate when it notes that the case law often cleaves related proceedings from core proceedings based upon the presence of a debtor or its bankruptcy estate as a party to the proceeding. *E.g., Abramowitz v. Palmer,* 999 F.2d at 1277 (citing *In re Marine Iron & Shipbuilding Co.,* 104 B.R. at 980). However, it ignores the fact that the motion at bar directly and necessarily comes out of a core proceeding in this case, the Debtor's motion for authority to conduct a sale of assets of the estate free and clear of liens. *See* 28 U.S.C. § 157(b)(2)(N) (identifying "orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed the claims against the estate" as core proceedings in bankruptcy case). Core proceedings under 28 U.S.C. § 157(b) fall under the "arising under" or "arising in" jurisdiction of 28 U.S.C. § 1334(b). *In re Wood,* 825 F.2d 90, 96 (5th Cir.1987). Then, "the enforcement of orders resulting

courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under [the Bankruptcy Code], or arising in or related to cases under [the Bankruptcy Code].

**13.** Section 1334(b) creates two different categories of bankruptcy case proceedings, core proceedings and related proceedings. Both types of proceedings are subject to federal-court jurisdiction. The distinction between

them goes to the assignment of authority to enter a final judgment or order, as between bankruptcy judges and district judges, which is made under 28 U.S.C. § 157. *In re Cassidy Land and Cattle Co., Inc.,* 836 F.2d 1130, 1131–1132 (8th Cir.1988); *In re Marine Iron & Shipbuilding Co.,* 104 B.R. 976, 980 n. 5 (D.Minn.1989); *In re Farmland Indus., Inc.,* 296 B.R. 793, 802–804 (8th Cir. BAP 2003).

from core proceedings are [sic] themselves considered core proceedings." *In re Williams*, 256 B.R. 885, 892 (8th Cir. BAP 2001) (citing *In re Skinner*, 917 F.2d 444, 447 (10th Cir.1990)). *See also In re Trans World Airlines, Inc.*, 278 B.R. 42, 49 n. 16 (Bankr.D.Del.2002) ("Core proceedings under [28 U.S.C.] § 157(b)(2)(N) are those which arise from, concern, or have some impact on '*orders* approving the sale of property' . . ." (emphasis in original)); *In re Texaco Inc.*, 182 B.R. 937, 944 (Bankr. S.D.N.Y.1995) (proceeding to enforce and construe order confirming a Chapter 11 plan is core proceeding because original proceedings on confirmation were core proceedings).

On its face, the statute defines the Asset Sale Order as a core proceeding in itself. Perforce, the Debtor's motion that led to the entry of that order had been a core proceeding. A request for a construction and an enforcement of the order is a core proceeding by derivation—even if the debtor is not a party-movant or–respondent to the request. United Taconite's motion, therefore, is within the bankruptcy jurisdiction of the federal courts, and centrally so.[14]

 In a different sense, the bankruptcy court can properly exercise the bankruptcy jurisdiction over a request for the construction of one of its orders, under the broader concept of an inherent retained jurisdiction "to implement effectively its function of administering the Bankruptcy Code." *In re Franklin*, 802 F.2d 324, 326 (9th Cir.1986). "Simply put, bankruptcy courts must retain jurisdiction to construe their own orders if they are to be capable of monitoring whether those orders are ultimately executed in the intended manner." *Id. Cf. In re Clark*, 223 F.3d 859, 864 (8th Cir.2000) ("Section 105 gives to bankruptcy courts the broad power to implement the provisions of the bankruptcy code . . ."). This is clearly a case for the exercise of that jurisdiction, which derives from the unquestioned jurisdiction over the proceeding that generated the order at issue.

Under both of these rationales, this Court has jurisdiction over United Taconite's motion in the first instance.

### 2. Whether the Federal Courts are Deprived of their Jurisdiction by the Tax Injunction Act.

 As a second argument, MDOR maintains that the Tax Injunction Act, 28 U.S.C. § 1341, deprives the federal courts of jurisdiction over United Taconite's motion.[15] The Supreme Court has identified the role of this statute in preserving a fundamental balance between national and state sovereignty in our federal system:

14. As applied to a sale free and clear of liens, there are also good policy reasons for making a derivative core-proceeding classification under the *Williams* rationale. Active bidding on assets from bankruptcy estates will be promoted if prospective purchasers have the assurance that they may go back to the original forum that authorized the sale, for a construction or clarification of the terms of the sale that it approved. Relegating post-sale disputes to a different forum injects an uncertainty into the sale process, which would dampen interest and hinder the maximization of value. A purchaser that relies on the terms of a bankruptcy court's order, and whose title

and rights are given life by that order, should have a forum in the issuing court.

15. In pertinent part, this statute provides:

The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

As a unit of the district court, 28 U.S.C. § 151, and a recipient of this case by reference pursuant to 28 U.S.C. § 157(a) and Loc. R. Bankr.P. (D.Minn.) 1070–1, this Court is subject to this statute.

The federal balance is well served when the several States define and elaborate their own laws through their own courts and administrative processes and without undue interference from the federal judiciary. The States' interest in the integrity of their own processes is of particular moment respecting questions of state taxation.

*Arkansas v. Farm Credit Services of Cent. Arkansas,* 520 U.S. 821, 826, 117 S.Ct. 1776, 1780, 138 L.Ed.2d 34 (1997). Given the statute's long-standing precedence in the American understanding of federalism, *Arkansas Corp. Com'n v. Thompson,* 313 U.S. 132, 145, 61 S.Ct. 888, 893, 85 L.Ed. 1244 (1941), the courts are to accord substantial deference to the states' interest in the prompt and efficient collection of state-levied taxes when they interpret the statute, *Arkansas v. Farm Credit Services of Cent. Arkansas,* 520 U.S. at 826, 117 S.Ct. at 1780. The Tax Injunction Act bars "anticipatory relief, suits to stop ('enjoin, suspend, or restrain') the collection of taxes." *Jefferson County, Ala. v. Acker,* 527 U.S. 423, 433, 119 S.Ct. 2069, 2076, 144 L.Ed.2d 408 (1999). This includes actions for declaratory relief that could interfere with states' collection processes. *California v. Grace Brethren Church,* 457 U.S. 393, 396, 102 S.Ct. 2498, 2501, 73 L.Ed.2d 93 (1982), *Burris v. City of Little Rock,* 941 F.2d 717, 720 (8th Cir.1991); *Coon v. Teasdale,* 567 F.2d 820, 822 (8th Cir.1977).

 Nonetheless, the Tax Injunction Act does not mandate the relinquishment of jurisdiction every time a taxpayer seeks to litigate with a state in the federal courts over the state's assessment or enforcement procedure. To trigger the Act's bar, a "plain, speedy and efficient remedy" must be available in the state courts. A remedy in the state forum meets these criteria if it "provides the taxpayer with a 'full hearing and judicial determination' at which she may raise any and all constitutional objections to the tax." *Rosewell v. LaSalle Nat. Bank,* 450 U.S. 503, 514, 101 S.Ct. 1221, 1230, 67 L.Ed.2d 464 (1981). *See also California v. Grace Brethren Church,* 457 U.S. at 408, 102 S.Ct. at 2507. If "the *taxpayer's federal rights* receive full consideration, the [state-court] remedy is adequate" under the Tax Injunction Act. *Burris v. City of Little Rock,* 941 F.2d at 720 (citing *Rosewell v. LaSalle Nat. Bank,* 450 U.S. at 514–515, 101 S.Ct. at 1229–1230) (emphasis added). However, if there is uncertainty concerning the availability or effect of a remedy for a federal-law issue in the state forum, the state process may fail the requirement of being "plain." *Rosewell v. LaSalle National Bank,* 450 U.S. at 516–517, 101 S.Ct. at 1231; *Ashton v. Cory,* 780 F.2d 816, 819 (9th Cir.1986).

In the case at bar, the nature of the substantive issue is pivotal to the matter of jurisdiction under the Tax Injunction Act. United Taconite requests a determination that MDOR could not use any production experience from the Debtor's operations in assessing taconite production tax on United Taconite's post-sale production, on the ground that the State's asserted right to do so created or evidenced "an interest" in the assets that had been detached by the Asset Sale Order. This issue is a matter of federal bankruptcy law in the first instance, because it comes out of a proceeding created by and authorized under federal law. Minnesota state law has some bearing on the outcome, but it only goes to whether the original federal-law remedy even applies to the subject of the parties' dispute.[16]

---

**16.** In the motion at bar, United Taconite does not challenge the legality or propriety of the assessment under the statutory scheme for the taconite production tax. Its counsel acknowledged this at oral argument.

To cut to the outcome: the Minnesota statutory scheme simply does not provide an alternate forum that would qualify under the Tax Injunction Act. At the administrative-agency level, the Minnesota state dispute resolution process can not take cognizance of the federal issue at all. At the judicial level, it is not crystal-clear that the state district court could do so either. In any event, the framework through which the issue would be navigated to put it before the state court has several points of discretionary application. These interstices portend not only delay, but an inherent uncertainty in the identity of the ultimate decision-maker. Given that, the process is not "plain, speedy and efficient" for the presentation of a federal-law issue.

The process already pending before this Court is. This forum is ready to exercise its remedies immediately. There is no showing that the Minnesota state agency or courts can. As a result, the Tax Injunction Act does not bar this Court from exercising jurisdiction over the issue posed by United Taconite's motion.

This result is dictated by the structure for the two avenues of appeal that are available under Minnesota law to a taxpayer aggrieved by an assessment of state taxes.

In the first avenue, the taxpayer may make an "administrative appeal" to the Minnesota Commissioner of Revenue, to seek "reconsideration ... of an order assessing tax." Minn.Stat. § 289A.65, subd. 1. By its very nature, this "reconsideration" goes only to the matters actually addressed in the making of the assess-

ment.[17] The taxpayer may petition the Minnesota Tax Court for a review of an adverse determination by the Commissioner, or a failure by the Commissioner to take action on a request for reconsideration. Minn.Stat. § 289A.65, subds. 8–9.

 In the second avenue, the taxpayer may appeal an assessment directly to the Minnesota Tax Court. Minn.Stat. § 276.01, subd. 2. The statute governing the scope of this process states that the Tax Court's determination is to be "*de novo*," though it also provides that "the order of the Commissioner or the appropriate unit of government in every case shall be *prima facie* valid." Minn.Stat. § 271.06, subd. 6. A taxpayer's appeal before the Tax Court is "an original proceeding in the nature of a suit to set aside or modify the [Commissioner's or governmental unit's] order or determination." As a forum, the Minnesota Tax Court is "an administrative agency of the executive branch," having "limited jurisdiction and no original jurisdiction to hear constitutional matters." *Erie Min. Co. v. Commissioner of Revenue*, 343 N.W.2d 261, 264 (Minn.1984). This is because the grant of decision-making authority and jurisdiction to the tax court is strictly limited by subject matter, to "all questions of law and fact *arising under the tax laws of this state* ..." Minn.Stat. § 271.01, subd. 5 (emphasis added). If presented with a constitutional issue, the tax court must transfer the constitutional challenge to the state district court, which may then consider and decide it or refer it back to the Tax

---

17. This is a matter of logical inference, from several of the statutory provisions that govern the reconsideration-and-appeal procedure: Minn.Stat. § 289A.65, subd. 4(7) ("[t]he [administrative] appeal ... must contain ... the findings *in the notice* [of assessment] that the taxpayer disputes ...") and 4(8) (requiring a

"summary statement that the taxpayer relies on for each [such] exception"). Clearly, the appealing taxpayer designates the issues to be addressed in the administrative forum. However, the universe of issues is bounded by those raised via the assessment in the first place.

Court. *Wilson v. Commissioner of Revenue,* 619 N.W.2d 194, 199 (Minn.2000).

Clearly, the Minnesota Tax Court lacks the authority to entertain and decide the issue of bankruptcy law posed here. The Commissioner's statutory authority to reconsider an assessment is equally limited, if not more so; that official's consideration clearly is circumscribed by the scope of the determination made in an assessment. The MDOR performs the assessment process in its regulatory and tax-collecting capacity; all considerations other than those specified in tax statute and regulation are extraneous.

In sum, the administrative-agency track of Minnesota's procedure lacks a remedy for the alleged wrong that United Taconite identifies. Insofar as those avenues are concerned, the Tax Injunction Act does not bar the federal courts from exercising jurisdiction here.

The judicial-review track goes more directly to the Tax Injunction Act's specific prescriptions for state-law remedies. Minnesota's procedure would require the federal-law issue to be raised in the Tax Court in the first instance. Then, MDOR would have its opportunity to object to jurisdiction. Then the Tax Court would have to transfer the appeal (or some part of it) to the state district court. Then the district court might return the issue or the whole appeal to the Tax Court for litigation and decision there. And, of course, this all assumes that an issue of statutory construction under federal bankruptcy law is a corollary to the constitutional issues that *Wilson* commits to this routing—a

point not addressed by Minnesota statute or appellate opinion to date.[18]

The judicial track under Minnesota procedure simply poses too much uncertainty for a prompt and efficient adjudicated resolution of United Taconite's issue. At the very least, the prospect of a meritorious challenge by United Taconite on procedural grounds would portend significant delay: the jurisdictional issue is serious, it might be one of first impression, and in any event it would require substantial judicial attention.

Among the substantial doubt over the threshold availability of a forum in a general-jurisdiction court, the uncertain identity of the ultimate decision-maker, and the likelihood of significant delay, any remedy under Minnesota state procedure would not be plain, speedy, or efficient. From the standpoint of a possible tracking of the issues at bar through a state court of general jurisdiction, the Tax Injunction Act does not bar federal jurisdiction over this motion either.

### 3. Conclusion.

The theory of MDOR's late-raised challenge to jurisdiction is without merit.[19] This Court has full authority to pass on United Taconite's motion.

## II. The Merits.

### A. Theory of United Taconite's Motion.

United Taconite argues that the Asset Sale Order cut off MDOR's right to assess taconite production tax against United Taconite, through any calculation that factors in the Debtor's production experience in previous years. Its theory is two-

---

**18.** This would give even more doubt that a "remand" of the federal-law issue to the Tax Court would be within that tribunal's jurisdiction.

**19.** In no way is this a pronouncement on the competency and effectiveness of the Minnesota Commissioner of Revenue, the Minnesota Tax Court, or the state district courts to address the matters of state tax law that the legislature has committed to them in the first instance.

pronged, structured on different substantive aspects of the Asset Sale Order. The first is the authorization for a sale free and clear, expressly founded on § 363(f) and effected in Term G of the order. The second is the more generally-phrased bar on any assumption by United Taconite of "any taconite production tax attributable to taconite ore ... mined by [the] Debtor," etc., effected in Term F of the order. In result and perhaps in substance, these provisions seem to duplicate each other. However, they have independent significance because United Taconite urges that the facial terms of a now-final order bind MDOR as much as the independent agent of § 363(f) does.

As to the first prong, the argument is that the facility's actual production experience under the Debtor, and any legal attribute or consequence of that experience, were an "interest" within the contemplation of § 363(f), which was detached from the assets during the course of the sale free and clear.

As to the second prong, the argument is that Term F squelches MDOR's assessment, because by applying the averaging method to United Taconite as it did, MDOR really was reaching back to the Debtor's pre-sale production, in a fashion that effectively attributed that to United Taconite—after United Taconite was judicially deemed to have not assumed any tax burden from the Debtor's production.

From both prongs, United Taconite argues that by necessary implication it took the facility for its own operations free of any past production experience otherwise to be deemed to it in the calculation of its own taconite production tax liability. It seeks declaratory relief to that effect. It also requests injunctive relief to compel MDOR to calculate taconite production tax going forward, with a "clean slate" of *no* pre-sale production for the assessment for 2003, and for any subsequent year.

### B. Nature and Function of a Sale Free and Clear.

Vested with the powers of a trustee pursuant to 11 U.S.C. § 1107(a), the Debtor sold the facility to United Taconite under color of a key provision of the Bankruptcy Code:

The trustee may sell property [of the bankruptcy estate] free and clear of any interest in such property of an entity other than the estate, only if—

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Through this remedy, third parties' "interests" in property are detached from the asset to be sold, and then may be reattached to the cash or in-kind proceeds of sale that the trustee receives.[20] As a matter of statute or under

---

**20.** The attachment of a replacement lien or interest to sale proceeds is granted pursuant to 11 U.S.C. § 363(e) ("... on request of an entity that has an interest in property ... sold ... by the trustee, the court ... shall ... condition such ... sale as is necessary to provide adequate protection of such interest ..."), in order to afford adequate protection within the contemplation of 11 U.S.C. § 361(2) ("... providing ... an additional or replacement lien to the extent that such ... sale ... results in a decrease in the value of [the interest-holder's] interest in such property ...").

general equitable principles, the remedy has been a part of American bankruptcy law for well over a century. *E.g., Van Huffel v. Harkelrode,* 284 U.S. 225, 227–228, 52 S.Ct. 115, 116–117, 76 L.Ed. 256 (1931); *Ray v. Norseworthy,* 23 Wall. 128, 90 U.S. 128, 134–135, 23 L.Ed. 116 (1874); *In re Waterloo Organ Co.,* 118 F. 904, 906 (W.D.N.Y.1902). By affording clear title to purchasers from the estate, sales under § 363(f) make the estate's assets more attractive in the market. This, in turn, can "maximize the value of the asset[s], and thus enhance the payout made to creditors" on a full administration of the estate. *In re WBQ Partnership,* 189 B.R. 97, 108 (Bankr.E.D.Va.1995). *See also In re Lady H Coal Co., Inc.,* 199 B.R. 595, 605 and 607 (S.D.W.Va.1996).

By its very terms, the statute allows the detachment of an "interest" in property. A lien, security interest, or other formal encumbrance against an asset is, of course, subject to § 363(f). Along with other *in rem* attributes, liens have been considered as "interests" in property for the purposes of § 363(f) since the Code's enactment. *E.g., In re Arctic Ents., Inc.,* 68 B.R. 71, 78–79 (D.Minn.1986); *In re White Motor Credit Corp.,* 75 B.R. 944, 948 (Bankr. N.D.Ohio 1987); *In re New England Fish Co.,* 19 B.R. 323, 326 (Bankr.W.D.Wash. 1982). The statute, however, does not use the word "lien"—which is defined for the Code's purposes, 11 U.S.C. § 101(37).[21] Rather, it uses "interest," a word that intuitively and in statutory context seems broader, but which is not defined in § 101 or anywhere else in the Code. George W. Kuney, *Misinterpreting Bankruptcy Code Section 363(f) and Undermining the Bankruptcy Process,* 76 AM. BANKR. L.J. 235, 257 (2002). In a number of published decisions the courts have tried to define

just how much broader than "lien" the idea of "interest" goes. This is the issue posed by United Taconite.

■ Any treatment of this issue has to recognize a bedrock principle: in bankruptcy cases, the rule of decision for the nature of rights and interests in property is furnished by state law where no controlling federal law would govern. *Barnhill v. Johnson,* 503 U.S. 393, 398, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992); *Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); *In re Johnson,* 375 F.3d 668, 669–70 (8th Cir. 2004); *Johnson v. First Nat. Bank of Montevideo, Minn.,* 719 F.2d 270, 273–274 (8th Cir.1983), *cert. denied,* 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984). United Taconite posits the existence of a pre-sale "interest" in the facility in favor of the State of Minnesota; MDOR's rights as taxing authority are statutory in origin. Thus, the structure of Minnesota's taconite production tax scheme is the key to the outcome on this issue.

### C. Minnesota's Taconite Production Tax Scheme.

Under the law in effect when this motion was argued, these provisions imposed the taconite production tax for the relevant years:

(a) For concentrate produced in 2001, 2002, and 2003, there is imposed upon taconite and iron sulphides, and upon the mining and quarrying thereof, and upon the production of iron ore concentrate therefrom, and upon the concentrate so produced, a tax of $2.103 per gross ton of merchantable iron ore concentrate produced therefrom.

(b) For concentrates produced in 2004 and subsequent years, the tax rate shall

**21.** This statute defines "lien" as "charge against or interest in property to secure payment of a debt or performance of an obligation."

be equal to the preceding year's tax rate plus an amount equal to the preceding year's tax rate multiplied by the percentage increase in the implicit price deflator from the fourth quarter of the second preceding year to the fourth quarter of the preceding year. "Implicit price deflator" means the implicit price deflator for the gross domestic product prepared by the bureau of economic analysis of the United States Department of Commerce.[22]

Minn.Stat. § 298.24, subd. 1(a)-(b).

It is "the intent of this [provision] to impose a tax based upon the weight of merchantable iron concentrate . . .," Minn. Stat. § 298.24, subd. 1(f). For the annual assessment of taconite production tax, the number of "gross ton[s] of merchantable iron ore concentrate produced" is calculated as an average of the past three years' production, rather than just the production for the year of the assessment:

(d) The tax shall be imposed on the average of the production for the current year and the previous two years. The rate of the tax imposed will be the current year's tax rate. This clause shall not apply in the case of the closing of a taconite facility if the property taxes on the facility would be higher if this clause and section 298.25 were not applicable.

Minn.Stat. § 298.25, subd. 1(d).

▆▆ This tax and its related taxes,[23] . . . shall be in lieu of all other taxes upon such taconite, iron sulphides, and direct reduced ore or the lands in which they are contained, or upon the mining or quarrying thereof, or the production of concentrate or direct reduced ore

therefrom, or upon the concentrate or direct reduced ore produced, or upon the machinery, equipment, tools, supplies and buildings used in such mining, quarrying or production, or upon the lands occupied by, or used in connection with, such mining, quarrying or production facilities . . .

Minn.Stat. § 298.25. *See also Walker v. Zuehlke,* 642 N.W.2d 745, 747 (Minn.2002); *Pickands Mather & Co. v. Commissioner of Revenue,* 334 N.W.2d 155, 157 (Minn. 1983). However, despite the base on which the tax is calculated-the weight of a product beneficiated from extracted ore— the taconite production tax is considered to be a property tax under Minnesota law. *Erie Min. Co. v. Commissioner of Revenue,* 343 N.W.2d 261, 265–266 (Minn.1984). "[T]he use of production is merely a computational method chosen by the legislature to arrive at the value of property used for taconite production." *Erie Min. Co. v. Commissioner of Revenue,* 343 N.W.2d at 264. "[T]he tax is not imposed on production itself, but . . . production is used as a means of computing the in lieu tax imposed by the statute." *Erie Min. Co. v. Commissioner of Revenue,* 343 N.W.2d at 265.

There is no provision in Minn.Stat. §§ 298.24–298.27 for the imposition of a lien for the assessment of the taconite production tax in particular. Rather, the availability of a lien for the collection of the tax is governed by Minnesota's general tax lien statute, Minn.Stat. § 270.69. That provision states that the "tax imposed by any chapter administered by the commissioner of revenue . . . become[s] a lien . . . from and after the date of assessment of the tax," Minn.Stat. § 270.69, subd. 1,

---

**22.** Minn.Stat. § 298.24, subd. 1(c) imposes an additional tax on iron ore concentrate that has a higher iron content. Its details are not relevant here.

**23.** Specifically, "... the occupation tax imposed upon the business of mining and producing iron ore ..." under Minn.Stat. § 298.01, subd. 4. Minn.Stat. § 298.25.

which then becomes enforceable when "a notice of lien has been filed by the commissioner of revenue," Minn.Stat. § 270.69, subd. 2(a). Before United Taconite had purchased the facility, none of these steps had been taken, as to any taconite production tax liability it could have had or would have.

### D. Analysis.

While simple on their face, United Taconite's arguments are difficult to parse out. Ultimately, the best way to treat them is to cut to the chase, to enunciate the component results, and to backfill each result with its rationale.

### 1. Minnesota's Taconite Production Tax Scheme and Its Application by MDOR Did Not Create, Recognize, or Enforce an "Interest" in Property That Was Subject to 11 U.S.C. § 363(f).

■ For its statutory argument, as to the key concept of an "interest" in property, United Taconite states:

> Although some courts have limited the term to *in rem* interests in the property, the trend seems to be in favor of a broader definition that encompasses other obligations that may flow from ownership of the property ... [T]he term "interest" is intended to refer to obligations that are connected to or arise from the property being sold.

Counsel does not expand on the underlying theory very much, but it is clear that United Taconite postulates the three-year averaging formula as the source or the reflection of a pre-sale "interest" in the facility in favor of MDOR. It acknowledges that MDOR did not hold a lien, as such, in the facility before the sale. However, it maintains that simply through the possibility of a future inclusion of pre-sale production experience in the calculation of post-sale tax, MDOR took an "interest" in the facility that was subject to divestment in a sale under § 363(f).

In arguing for a very broad conceptualization of "interest," United Taconite relies on two decisions by circuit courts of appeal: *In re Trans World Airlines, Inc.,* 322 F.3d 283 (3d Cir.2003) and *In re Leckie Smokeless Coal Co.,* 99 F.3d 573 (4th Cir.1996). There are several compelling reasons *not* to rely on the reasoning of these decisions, one of which was built on the other.

In *Leckie Smokeless Coal,* the debtors-coal producers had substantial payment obligations, past and future, to multi-employer benefit plans or funds. A federal statute, the Coal Industry Retiree Health Benefit Act of 1992,[24] imposed joint and several liabilities for those obligations on any "successor in interest" to a covered coal producer. The statute did not define the term "successor in interest." After the debtors filed for relief under Chapter 11, they sought to sell their assets to third parties. The third parties insisted that they take the "property 'free and clear' of all successor liabilities that might arise under the Coal Act," through the means of a sale under § 363(f). 99 F.3d at 577. The debtors moved for court approval of a sale under such terms. The district court[25] held that the purchasers would not be the debtors' successors in interest within the meaning of the Coal Act; that the purchasers could not be held liable for the debtors' obligations under the Coal Act; and that § 363(f) "authorized the Bankruptcy Court to permit the sale of [the

---

24. Codified at 26 U.S.C. §§ 9701–9722.

25. The district court had withdrawn reference from the bankruptcy court, after the benefit

plan objected to the debtors' motion. 99 F.3d at 577–578.

debtors'] assets *free and clear* of their Coal Act *obligations* ..." 99 F.3d at 573 (emphasis added).[26]

On appeal, the Third Circuit identified one of the issues before it as whether the benefit plans' "respective interests in receiving premium payments [were] within the scope of the statute," i.e., § 363(f). 99 F.3d at 581. It started by acknowledging its own precedent that "general unsecured claims do not constitute 'interests' within the meaning of § 363(f)." *Id.* It then identified a lack of congressional intent to limit the concept of "interest" to *in rem* interests. 99 F.3d at 582. It opined that it was "difficult to make further categorical observations concerning the intended meaning of the words 'interest in.'" *Id.* With no other expansion or explanation, it then pronounced:

> [The plans'] rights to collect premium payments from [the debtors] constitute interests in the assets that [the debtors] now wish to sell, or have sold already. Those rights are grounded, at least in part, in the fact that those very assets have been employed for coal-mining purposes: if [the debtors] had never elected to put their assets to use in the coal-mining industry, and had taken up business in an altogether different area, [the plans] would have no right to seek premium payments from them. Because there is therefore a relationship between (1) [the plans'] rights to demand premium payments from [the debtors] and (2) the use to which [the debtors] put their assets, we find that the [plans] have interests in those assets within the meaning of section 363(f).

*Id.*

This is the first authority that United Taconite cites for a less-bridled construction of "interest" in the application of § 363(f). The other is *In re Trans World Airlines, Inc.,* 322 F.3d 283 (3d Cir.2003) ("*TWA*").

In *TWA,* the dispute revolved around the debtor's liability to furnish free travel to individual employees, on account of vouchers that had been issued to those employees in settlement of a gender-discrimination class action lawsuit. A post-petition purchaser of the debtor's assets sought to take those assets "free and clear" of any obligation to honor the vouchers. The debtor requested such a provision in its motion for authority to sell. The bankruptcy court overruled the objections of the Equal Employment Opportunity Commission and the class of plaintiffs, and authorized the sale.

There is no indication in *TWA* that the terms of the settlement would make the travel-voucher obligations binding on any purchaser of the debtor's assets. Nor is there any reference in the opinion to any legal authority, statutory or otherwise, that would give rise to "successor liability" in such a purchaser. In fact, "the bankruptcy court [had] determined that there was no basis for successor liability on the part of [the purchaser] and that the [employees'] claims could be treated as unsecured claims." 322 F.3d at 286. Nonetheless, the bankruptcy court had included verbiage in its order that purported to direct "free and clear delivery of the Assets to include ... employment related claims. ... and successorship liability accrued up to the date of closing ..." 322 F.3d at 286–287.

On appeal by the EEOC and the class of plaintiffs, the district court and the Third

---

**26.** The opinion in *Leckie Smokeless Coal* was issued in consolidated appeals out of two different groups of bankruptcy cases. In reaching his decision, the district judge in the second group relied on the decision of the district judge in the first group. 99 F.3d at 579.

Circuit affirmed the bankruptcy court. The Third Circuit cited its earlier decision, *Folger Adam Security, Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252 (3d Cir. 2000), in which it had applied *Leckie Smokeless Coal* to a very different configuration of parties and claims in a sale under § 363(f). It went on to observe, none too firmly, that

> [w]hile the interests of the EEOC and the ... class [of plaintiffs] in the assets of [the debtor's] bankruptcy estate are not interests in property in the sense that they are not *in rem* interests, the reasoning of *Leckie and Folger Adam suggests that* they are interests in property within the meaning of [§ ] 363(f) in the sense that they arise from the property being sold.

322 F.3d at 290 (emphasis added).

In *TWA*, the Third Circuit put special weight on its observation in *Folger Adam* that "the term 'any interest' is intended to refer to obligations that are connected to, or arise from, the property being sold." 322 F.3d at 289 (quoting *Folger Adam*, 209 F.3d at 259). The *TWA* court, however, does not overtly pass on the question of whether successor liability on account of the travel-voucher claims would have lodged against a purchaser of the debtor's assets, let alone whether the incipience of successor liability, figuratively floating over its debtor, somehow could have become choate and then attached to the transferred assets upon a sale. Even more than in *Leckie Smokeless Coal*, the

analysis in *TWA* is built on an amorphously inclusive rationalization; it posits a loose sort of "but-for" causality that is thrown up to identify the straw-built "interest" that then is vanquished. Given the trial court's express holding that there was no *in personam* successor liability, and the lack of a statutory basis for successor liability, *TWA* offers even fewer boundaries for application of this causally-oriented definition of "interest" than did *Leckie Smokeless Coal*.[27]

In the last instance, the reasoning of these opinions fails on an alternate basis: they do not take the inquiry back to where it belongs, the governance of state law in the defining of "interest." As recognized in *Butner v. U.S.*, this is a matter of federalism. 440 U.S. at 52–56, 99 S.Ct. at 917–918. *See also In re Johnson*, 375 F.3d at 669–70 (reversing Bankruptcy Appellate Panel, which had held, 288 B.R. 130, 132–133 (8th Cir. BAP 2003), that there was "no need to look to state law" on nature of debtor's post-dissolution marital lien rights in dispute over claim under 11 U.S.C. § 522(d)(1) of homestead exemption thereto, because Bankruptcy Code contained definition of "lien").[28]

Thus, the guidance here comes from the Minnesota Supreme Court's analysis of the taconite production tax scheme. Under that authority, the three-year averaging formula does not effect taxation in a current year, of production that was completed in a past year—however much that may

---

**27.** The causal orientation may derive in a broad way from the "product line" theory of successor liability in products-liability law, which arose under judicial enunciation and spread to several jurisdictions over the last several decades. *See* Kuney, *Misinterpreting Bankruptcy Code § 363(f)*, 76 AM BANKR. L.J. at 259–260 n. 92 (summarizing theories of successor liability under nonbankruptcy law). However, neither the Third nor the Fourth Circuits say this—or anything more about the source of the thought. Kuney aptly criticizes the rationale of *Leckie Smokeless Coal*, through the conceptual structure of bankruptcy law as well as the basic principles of liability under American jurisprudence. *Id.* at 257–272.

**28.** It should be noted that the concurrence in *Folger Adam* got it right. *See* 209 F.3d at 266–268.

seem to be happening where production volume in a current year is greatly less than that in the past two. The formula just reaches something cognate to the economic value of the underlying facility, commensurate to its current operation. It reflects in variant the principle underlying the *ad valorem* real estate tax that the production tax replaces. The production of a past year in the cycle does not give rise to some persisting property attribute in favor of MDOR, which becomes choate upon use of the averaging formula in a later year. Nor does it create a successor liability in the common understanding. *Folger Adam's* vague notion of a connection to or an arising from the facility used in the production is irrelevant, because Minnesota law controls. *Accord, In re Wolverine Radio Co.,* 930 F.2d 1132, 1145–1146 n. 18 (6th Cir.1991) (under state laws governing unemployment compensation program, experience history of debtor does not give rise to "interest" in debtor's assets in favor of state employment security commission, so as to bar commission from considering debtor's experience in setting contribution rate for a new operator that purchased assets from debtor in sale under § 363(f)).

Finally, prior to the sale, a lien under Minn.Stat. § 270.69 against the facility on account of United Taconite's production tax liability could not have even arisen, let alone become choate or enforceable. Under the governing state law, that was the only conceivable source of an "interest" in favor of MDOR.

MDOR thus did not hold or gain an "interest" in the facility as a result of the Debtor's production experience, which would have been detached from the facility so as to prevent it from using the three-year averaging formula in the way it did. United Taconite has no right to declaratory or injunctive relief on its first theory.

### 2. The Terms of the Asset Sale Order Itself Did Not Foreclose MDOR from Applying the Statutory Averaging Formula.

The thrust of United Taconite's non-statutory argument is that Term F of the Asset Sale Order bars MDOR from applying the averaging formula to the historical production experience of the taconite facility that it purchased. Hence, as United Taconite would have it, MDOR must apply the formula to the historic production experience of United Taconite alone, with its start of operations late in 2003 and with no production to be deemed to it for preceding years.[29]

The flaw in this argument is that Term F itself contemplates that the term is to be construed in light of the statutory scheme for the taconite production tax. The closing reference to Minn.Stat. §§ 298.24–298.27 reflects that intention beyond dispute. Thus, the "attribution" between "taconite ore ... mined by [the] Debtor" and the tax that United Taconite was *not* to assume is to be made in light of the statute—not pursuant to the intent of the parties to the Asset Purchase Agreement, and not from United Taconite's understanding alone.

Under *Erie Min. Co. v. Commissioner of Revenue,* this link of attribution is much more tenuous than United Taconite argues. The flow of iron concentrate pro-

---

**29.** This is not quite the way United Taconite's counsel phrases the argument, or the way he identified it in terms of legal methodology, but it is really what counsel is driving at. Term F is phrased with reference to individual "liabilities or obligations" of a predecessor-owner, in this instance production taxes "attributable to" that prior owner's operations, which under the order's directive are not to be "assume[d]" by United Taconite. The argument is built out from that notion of individual liability and non-assumption.

duction is taxed not in its own right, directly as it occurs. Rather, the volume of production is taken as a reflection of the value of the underlying assets to the taxpayer-operator, as evidenced in the assets' exploitation for commercial gain.[30]

Once that is recognized, it is clear that MDOR did not violate the letter of the Asset Sale Order. In making its assessment, it drew a line between the period of the Debtor's operation and the period of United Taconite's operation, readily discernible from the two operators' reports. It first calculated a tax by applying the statutory per-ton rate to the facility's production for the full year of 2003. Then it divided the resultant year's tax between the Debtor and United Taconite, based upon their proportion of the aggregate tonnage for the year. The division between the two accomplished the "attribution" of taxes contemplated by Term F. That assigned to the Debtor was capable of assertion in this case via a proof of claim.[31] That assigned to United Taconite was assessed directly to it. Under *Erie Min. Co.*, the application of the triennial averaging formula "was merely a computational method to arrive at the value" of the underlying hard asset that was actually being taxed. 343 N.W.2d at 264. It was not in any way a direct levy on account of the Debtor's past production, assessed against United Taconite by computational legerdemain. For the same reason, any use of past production volume in three-year averaging for the years after 2003 will not assess a tax "attributable to" pre-sale production by the Debtor.

Thus, MDOR's assessment did not violate the terms on the face of the Asset Sale Order. United Taconite is not entitled to declaratory or injunctive relief on this theory either.

### 3. Conclusion.

When it assessed taconite production tax for 2003 against United Taconite on February 13, 2004, MDOR did not act contrary to the letter or spirit of § 363(f); nor did it violate the terms of the Asset Sale Order. United Taconite is not entitled to any of the relief it sought from this Court via its motion.[32]

### ORDER

On the foregoing memorandum of decision,

---

**30.** In this regard, the rationale behind the taconite production tax is an imprecise corollary to the income method of valuation used in appraisal practice: recognizing that the *de facto* value of commercial property is largely driven by what an operating investor would pay for it, an appraiser will calculate its value by predicting a likely cash flow to be derived from future ownership and use, and then discounting it to present value. *See, in general,* discussion in *In re Kellogg Square Partnership,* 160 B.R. 343, 348–351 (Bankr.D.Minn.1993). The fact that the tax is assessed on a *volume* of actual production and not on its sale *value* does not weaken the analogy. The fact that the tax is not expressly *ad valorem* does not negate the obvious link among the level of production, the relative burden and benefit that production operations impose on the local community, and the effect of production level on the attractiveness of a taconite facility to current or prospective operator-owners.

**31.** To the date of this order, MDOR has not filed a proof of claim on account of its assessment against the Debtor for 2003.

**32.** For utter clarity, it will be said: this decision addresses only the issues between these parties that arose under bankruptcy law, or under the text of the order that was issued under the authority of bankruptcy law. It does not reach the propriety of the assessment, or MDOR's methodology in making it, under the principles of Minnesota state law, statutory or otherwise. Those issues are the province of the Minnesota Tax Court, to which the Debtor has appealed from the assessment on its merits under state law.

IT IS HEREBY ORDERED that the motion of United Taconite, LLC is denied in all respects.